# Wytheville.

SINGER MANUFACTURING COMPANY AND OTHERS v. BRYANT.

June 14, 1906.

1. MALICIOUS PROSECUTION—*Evidence—Conversations Between Plaintiff and His Counsel After Prosecution Begun.*—In an action for malicious prosecution the details of the private and confidential conversations between the now plaintiff and his counsel touching his defense to the criminal prosecution set on foot by the now defendant cannot be given in evidence. They are mere self-serving declarations, not explanatory of any fact in issue, nor relevant to the issue, which was whether the now defendant had probable cause for believing the now plaintiff guilty of the crime charged.

2. MALICIOUS PROSECUTION—*Evidence—Probable Cause—Uncommunicated Statements.*—In an action for malicious prosecution where the issue is the existence of probable cause, statements made before the criminal prosecution by the now plaintiff to a subordinate employee of the now defendant, who transacted all business with the said defendant through the said plaintiff, tending to show that said plaintiff claimed *bona fide* to be the owner of the money which he was charged with having embezzled, but which statements were never communicated to the now defendant, are not competent evidence. Such statements might be very material in defense of the charge of embezzlement, but would not be material to show want of probable cause for setting the prosecution on foot.

3. EVIDENCE—*Admissions—Receipts.*—The rule that a receipt is only *prima facie* and not conclusive evidence of payment applies only where there has been an error in the amount or a mistake as to the conditions under which the receipt is given. It has no application to a distinct independent admission.

4. MALICIOUS PROSECUTION—*Evidence—Admissions—Estoppel.*—When an agent has time and again signed statements to the effect that his accounts were settled in full and that he had received full

payment of all compensation due him, he will be thereafter estopped to deny their truth when his principal, in reliance upon their truth, has acted with reference to other matters with him. If upon the faith of their truth the principal has charged the agent with embezzlement, the agent will not be permitted to deny their truth for the purpose of showing want of probable cause in an action by him against his principal for maliciously prosecuting him for embezzlement.

5. MALICIOUS PROSECUTION—*Probable Cause—Evidence—Disclosures Subsequent to Prosecution.*—On a charge of embezzlement it is pertinent and material for the defendant to show that he, in good faith, claimed to own the money he is charged with having embezzled, but, if upon acquittal, he sues his employer for having maliciously prosecuted him for the embezzlement, he will not be permitted to set up a prior undisclosed claim of ownership. The question here is, did the employer have probable cause to believe the agent guilty; and all the evidence of claims asserted by the agent for the first time after the termination of the criminal prosecution and previously unknown to the employer, is irrelevant and tends but to confuse the minds of the jurors.

6. MALICIOUS PROSECUTION—*Probable Cause—Innocence of Plaintiff.*— In an action for malicious prosecution it is error to instruct the jury that "they are not to determine the guilt or innocence of the plaintiff, but the question of his guilt or innocence may be considered upon the question of probable cause." The guilt or innocence of the plaintiff is not an issue in the cause, and the judgment of acquittal is only admissible to show the termination of the prosecution. "Probable cause" is to be determined as of the time when the action complained of was taken.

7. MALICIOUS PROSECUTION—*Damages—Wealth of One Defendant.*— In an action for malicious prosecution against a corporation and two of its agents, when the only evidence as to the pecuniary worth of the defendants was a statement of a witness that the corporation defendant was "the biggest sewing machine corporation in the world and the wealthiest," and there was no evidence of any damage of any kind sustained by the plaintiff, nor of express malice on the part of the defendants, it was error to instruct the jury that "the wealth, if any, of defendants" was a proper element to be considered by them in estimating the damages which they might award by their verdict.

Statement.

8. Malicious Prosecution—*Malice—Punitive Damages—Wealth of De-
fendant.*—In an action for malicious prosecution, punitive dam-
ages may be allowed where express malice is shown, and evi-
dence of defendant's wealth and pecuniary ability is admissible
as a means of determining what would amount to punishment.

9. Malicious Prosecution—*Essentials—Case at Bar.*—To sustain an
action for malicious prosecution the plaintiff must allege and
prove a prosecution or proceeding against him which has termi-
nated not unfavorably to the plaintiff; that it was instigated or
procured by the co-operation of the defendant; that it was with-
out probable cause, and that it was malicious. In the case at bar
the only question is whether the defendant had probable cause
for instituting a prosecution of the plaintiff for embezzlement,
and, upon the evidence treated as upon a demurrer to the evi-
dence by the defendant, it is held that he did.

10. Malicious Prosecution—*Probable Cause—Burden of Proof—Malice.*
In an action for malicious prosecution the burden is on the
plaintiff to show want of probable cause on the part of the de-
fendant in setting on foot the criminal prosecution, and while
malice may be inferred from the want of probable cause, the
latter will never be inferred from the former, no matter how much
malice is shown. What constitutes probable cause is a question
for the court; but where the evidence is conflicting it is for the
jury to decide, under proper instructions from the court, whether
or not there was "probable cause."

11. Appeal and Error—*Cross-Errors—Judgment Reviewed—Moot Ques-
tions.*—Under Rule IX this court will not consider cross-errors
assigned by a defendant in error which do not look to the re-
versal, modification or correction of the judgment under review,
but which merely present for decision questions which may or
may not arise at a subsequent trial of the case.

Error to a judgment of the Circuit Court of the city of
Roanoke in an action of trespass on the case. Judgment **for**
the plaintiff. Defendants assign error.

*Reversed.*

The opinion states the case.

*Lucien H. Cocke* and *Wm. A. Glasgow, Jr.,* for the plaintiffs in error.

*Scott & Staples, Wm. Gordon Robertson* and *Edward W. Robertson,* for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

This writ of error brings under review the judgment of the Circuit Court of the city of Roanoke, upon a verdict of a jury for $5,000, in an action brought by defendant in error against plaintiffs in error to recover damages for an alleged malicious prosecution, charging defendant in error, as agent at Roanoke, Virginia, of the Singer Manufacturing Company, with the embezzlement of certain moneys, the property of his principal.

Bryant, the defendant in error, had been for many years the agent of the Singer Manufacturing Company, his first employment being at Norfolk, Va., in 1880, where he worked until 1884. In 1884 he moved to Hampton, and there continued his employment with the Singer Manufacturing Company, and in that year, the first in which he had been in charge of a local office of the company, he was discharged from his employment on account of being short in his accounts, having collected money for the company which he had not reported or paid over. After this shortage and his discharge he went to Washington, D. C., and his father, who was on his bond, paid up the shortage. After remaining in Washington some two years or more, Bryant came back to a point in the State of Virginia remote from the place where his shortage had occurred and obtained employment in selling the machines of another sewing machine company. In 1890 he applied to a man named Fuller for employment again with the Singer Manufacturing Company, at Lynchburg; Fuller having never seen him before,

and therefore knowing nothing of what had gone before when Bryant was in the employment of the company at Hampton. In the mean time, two other officers of the company, who had charge of the office under which Bryant was working when he became short in his accounts in 1884, and who collected the shortage from his bondsman, had left the State and gone to Kansas.   Upon being employed by Fuller in 1890, Bryant worked for the company at different points in Virginia, until finally, in 1898-'99, he was put in charge of the office of the company at Roanoke, where he remained until October, 1901, when he was discharged.   Some irregularities having occurred in the office conducted by Bryant at Roanoke, the company sent Special Agent Joseph Jackson to that city for the purpose of examining the condition of the office, and to straighten out the accounts and books of the company.   Jackson arrived in Roanoke on the 20th of July, 1901, made an examination of the office, checked up the accounts which had gotten into confusion, and, after remaining some weeks in Roanoke and the territory tributary to that office, was called to Richmond about the 1st of September, and returned to Roanoke the latter part of that month.   At this time there were in the hands of Bryant for collection on account of the company two claims—one against I. Sachs and the other against Talley—which claims had been placed by him with Edward Lyle, an attorney, for collection, and Jackson had seen Lyle once or twice about these collections, and pressed him to make them as quickly as possible.   The details of Bryant's accounts were, however, not known to Jackson at that time.

When Jackson returned from Richmond a statement was sent him from the Richmond office of the company, showing the status of the Sachs and Talley accounts, and as soon as it was received he informed Bryant that he had it, and was then going over to see Lyle about the matter; whereupon Bryant informed

him·that it was unnecessary to go to see Lyle, because Lyle had collected the money and paid it to him. Jackson, however, went to Lyle and found that he had collected a part of one of the claims in the month of June, and a part of the other in the early part of September, and the money had been paid to Bryant, but neither of these collections had been reported by. Bryant to the company. This fact was reported by Jackson at once to Fuller, the agent of the company at Lynchburg, and to Lambert, the agent of the company at Richmond, who was then in Lynchburg, and they directed him to discharge Bryant at once, which he did. Jackson continued his investigation, and ascertained that Bryant had sold a number of machines of the company and had failed to report the sales, or the money collected. These facts being reported by Jackson to Lambert, Jackson was directed by Lambert to investigate the accounts and transactions of Bryant further, and to report all the facts disclosed to Lyle, the attorney of the company, and to be guided by Lyle's advice as to any further action in the matter.

Jackson made reports to Lyle of all the facts in connection with Bryant's relations to the company and the acts he had done, and Lyle advised Jackson that the only proper thing to be done, under the facts as they appeared, was to cause a criminal warrant to be issued for the arrest of Bryant; but told him at the same time that as he (Lyle) would probably have to be a witness in the case, owing to the fact that his checks had been given to Bryant, he would advise him (Jackson) to place the entire matter in the hands of the attorney for the Commonwealth; and thereupon ·Lyle introduced Jackson to Mr. Perkins, who was the attorney for the Commonwealth for the city of Roanoke. Perkins then went over all the facts in the case with Jackson, Jackson explaining to him the method of the company in doing business with its agents, and the result was that Perkins prepared and caused to be issued a warrant charging Bryant with various embezzlements.

The method of doing business through its agents, which was followed in the case of Bryant, was that the company consigned to him at Roanoke machines which were to remain the property of the company until sold and paid for, and every Saturday night Bryant was required to make a report to the company at Richmond, showing what machines had been sold during the current week, and to certify that the report covered all the machines sold or leased, and all cash collected or received during the week, and also acknowledging payment in full for all services or claims against the company to date. These reports were regularly made and signed by Bryant on printed forms furnished by the company. Bryant was also required to and did make an inventory at certain periods, showing what machines were in his hands belonging to the company, the last of which reports was made by Bryant on September 14, 1901; but the investigation of the office, of which we have been speaking, disclosed that several of these reports were false and fraudulent, as to which we will speak more fully when we come to consider the evidence in the case.

The warrant prepared by Perkins, the attorney for the Commonwealth, and issued on the 12th of October, 1901, was some time thereafter tried by the police justice of the city of Roanoke, and resulted in a decision by the justice acquitting Bryant of the charges therein made; whereupon he brought this suit for malicious prosecution against the Singer Manufacturing Company, Lambert and Jackson, and recovered joint judgment against them, above mentioned.

The record in the case is voluminous, and the questions raised in the assignments of error made by counsel on behalf of plaintiffs in error, and in the cross-errors assigned for defendant in error, are very numerous, and have been argued at very great length and with ability and learning; but we deem it only necessary to consider the crucial questions presented, upon the deter-

mination of which, in our view of the case, the judgment complained of must stand or fall—the first relating to the rulings of the trial court in admitting certain evidence offered at the trial; second, the giving and refusing of certain instructions; and third, the refusal of a new trial to plaintiffs in error, on the ground that the verdict of the jury is contrary to the law and the evidence.

During the progress of the trial and the examination of Bryant as a witness in his own behalf, and after it had been shown by him that he was discharged from the employment of the Singer Manufacturing Company on the 2d of October, 1901, and after the warrant had been introduced showing that Bryant was charged with embezzlement at dates prior to his discharge, and after it was shown that he, subsequent to his discharge, had employed counsel, and after it had also been shown that Bryant, after his discharge, made up an account against the company for money which he claimed that the company owed him, Bryant was asked several questions concerning the correctness of this account, and also the question as to what advice his counsel, J. Allen Watts, gave him as to whether or not. he was entitled to the amounts claimed in the account, to which latter question objection was made, and the objection sustained. Whereupon J. Allen Watts was introduced on behalf of Bryant, and over the objection of plaintiffs in error was permitted to answer questions as to when he was employed by Bryant and what transpired between them after Bryant's discharge, giving declarations made by Bryant while consulting Watts as his counsel.

Manifestly the purpose of this evidence was to put before the jury a statement of Bryant's theory of his defense to the charges made against him in the warrant, and to impress the jury by his self-serving declarations with the idea that he retained the moneys that he was charged with having embezzled on the ground that the Singer Manufacturing Company owed

him money, and to show that there was nothing between himself and the company except a *bona fide* difference in a proper settlement of his accounts.

What Bryant may have said to Mr. Watts, his counsel, as to the theory of his defense to the charges made in the warrant, or what Mr. Watts may have said to him as to the account he had made up, had no relevancy whatever to the issue in this case. Clearly what he may have said to his counsel, or what his counsel said to him, could not be testified to by himself, and it is difficult to understand upon what grounds the same declarations sought to be elicited from him could be allowed to go to the jury through the medium of his counsel, with whom he had had interviews concerning the reasons which he considered sufficient to justify him in retaining the money that he was charged with having embezzled. These interviews took place, not only after the commission of the offense charged, but even after Bryant had been discharged from the service of the company. The issue in this cause is whether the Singer Manufacturing Company had reasonable cause to believe that Bryant had been guilty of embezzlement when the warrant so charging was set on foot; and clearly the details of private and confidential interviews between himself and his counsel as to his defense against that·charge were not proper evidence to go before the jury in this case. The reason for rejecting such testimony applies to all self-serving declaration, to whomsoever made, and applies with peculiar force to declarations made to counsel, for the reason that such communications are privileged and could not be availed of by an adversary under any circumstances.

It is conceded that this evidence, standing alone, would be improperly admitted; but it is insisted that it was a part of the *res gestae,* and proper to show the manner in which Bryant was treated, the circumstances under which his arrest was made, and

whether or not he retained the money under the *bona fide* claim of right.

*Scott & Boyd* v. *Shelor,* 28 Gratt. 896, is relied on as sustaining the contention that this evidence was a part of the *res gestae,* and therefore admissible; but that case does not sustain the contention. There it is held that the declarations of the party, to come within the terms of the operation of the rule admitting them in favor of the party by whom made, must accompany and explain an act done, which is a fact in issue, or is relevant to the issue.

That is by no means the case here. The intention of Bryant as to the money of his principal which he had retained was not relevant to the issue being tried in this cause, and from no point of view could his self-serving declarations to his counsel, before or after the charge in the warrant was made, have any relevancy whatever to the issue here.

The next assignment of error for consideration is the refusal of the court below to exclude testimony as to statements made by Bryant to one Ellis, who was an employee of the Singer Manufacturing Company under Bryant at Roanoke. Again it is insisted that this was relevant, as showing the *bona fides* of Bryant.

Ellis was but a salesman in the office at Roanoke, and this testimony was to the effect that Bryant informed him that he (Bryant) had in his possession certain money belonging to the company, and which was a part of the money he had been charged with embezzling; and that on another occasion Bryant asked him whether he should report certain sales or keep the money until he had a settlement, and that the witness, Ellis, told him that if the company owed him money and would not have a settlement and pay him, that he would keep the money until the settlement was had.

It is nowhere intimated in the evidence that such a conver-
sation between Bryant and Ellis, if it ever took place, was com-
municated to either of the plaintiffs in error at any time. ·
Bryant was the agent to whom Ellis had to account, and in the
natural course of the business conducted no communication
made by Bryant to Ellis could ever reach the company's main
office, as Ellis made no report to the company except through
Bryant, and Bryant could with perfect impunity disclose in-
formation to Ellis, knowing that the information would never
reach the office with which his own accounting was to be had.
However pertinent this evidence might have been in the trial
of the criminal cause, involving the guilt or innocence of
Bryant, it plainly had no relevancy to the issue in this cause,.
since the Singer Manufacturing Company could not be affected
with the knowledge of what Bryant chose to disclose to his
subemployee, Ellis, and which was never in fact communi-
cated to the company before the charge of embezzlement was.
made against Bryant.

The same reasoning why the evidence which we have just
discussed should have been excluded applies with equal force
to the evidence excepted to in bills of exceptions Nos. 6, 12, 13,
14 and 15.    Under the system of the Singer Manufacturing
Company, by which it conducted its business, all agents, as we
have already stated, were required to make weekly statements
on blank reports furnished by the company.   On the back of
these reports is the following certificate: "I hereby certify that
this report shows all machines sold or leased and all cash col-
lected or received by me since last report.   That all receipts.
issued have been on forms furnished by the Singer Manufactur--
ing Company as hereon reported; that this report exhibits all
business done by me to date, not heretofore reported; that the
location of machines in stock unsold, as shown hereon, is correct;.

that I have received full payment for all compensation and expense items due to me to date and the cash drawn by me in full for all demands against the Singer Manufacturing Company, except commissions which may hereafter become due under the conditions of my contract with the said company."

At the time the warrant was sworn out charging Bryant with embezzlement, he was, admittedly, in default to the company in the sum of $313.72, and the excuse he offered for this, after he was discharged, is that he had retained the money to repay himself what the company owed him. For the purpose of showing that the claim was insincere and untrue, the company pointed to the fact in proof that Bryant had certified over his signature week after week, and up to the time of his discharge, that he had received everything that was due him; whereupon he was allowed to prove by Ellis, one of the employees of his office, that this certificate does not mean what it says, because he (Ellis) had signed a similar certificate in his dealings with Bryant's office when the facts were not in accord with the certificate.

The only ground relied on as justifying the introduction of such evidence is that a receipt is *prima facie* and not conclusive evidence of payment. This is a well established principle, but only applies when there has been an error in the amount, or a mistake as to the conditions under which the receipt is given. Such are not the facts as to these transactions between Bryant and the company. He had made his claims and had been shown that they were without foundation, under his contracts with the company, and after that had signed statements of his transactions with the company up to the date of the last of these certificates given by him, and, therefore, the rule invoked as justifying the introduction of the evidence of Ellis and other witnesses that these certificates or receipts had no relevancy to this case whatever.

But upon another ground the injustice of permitting parol evidence of a third person, bearing a different relation to the company, to be introduced to impair the effect of the statements and receipts which Bryant had given, is apparent. He is clearly estopped to deny the full force and effect of these certificates, because on the faith of them the company had acted with reference to other matters with him. It might have acted in a very different manner had it known that Bryant could, or even intended, to impair the effect of these certificates. While he might with some plausibility have attacked the effectiveness of his certificates for the purpose of relieving himself of the charge of embezzlement, he should not be permitted to say that the company did not have reasonable cause to believe that it did not owe him anything; when he had certified time and again that all of his accounts were settled in full and that he had received full payment of all compensation due him.

After Bryant had been examined as to the facts of his employment by the Singer Manufacturing Company, and after there had been exhibited to the jury the various written contracts under which he had been working, there was presented to the jury what purported to be a debtor and creditor account between him and the company, of which mention has been made, and Bryant was permitted, over the objection of plaintiffs in error, to testify as to the correctness of that account, although it was not claimed that the company had any knowledge whatever of the existence of any such account when the warrant charging him with embezzlement was issued. To the introduction of this account and the testimony of Bryant as to the correctness of its several items plaintiffs in error excepted, and these exceptions may be considered together.

Here again counsel for Bryant contend that this evidence is admissible on the question of malice and probable cause, as

tending to show the *bona fides* of the claim of right made by Bryant after his discharge from the company's employment to retain the moneys of his principal for which he had not accounted, and along this line a great deal of evidence went to the jury, whereby the minds of the jury were diverted from the true issue in a case for malicious prosecution to the issue in a prosecution for embezzlement, where evidence would be admissible to show the *bona fides* of the accused in rebuttal to evidence tending to prove his intent to commit the offense. It was not material to the investigation before the jury in this case whether Bryant was indebted to the Singer Manufacturing Company, or whether the company owed him; but the sole question was whether plaintiffs in error had reasonable cause to believe that he had fraudulently converted certain moneys collected by him, as agent for the company, to his own use. If Bryant had been successful in proving the correctness of his account, it would not have tended to prove that the plaintiffs in error were liable in this action, since there was no evidence introduced tending to prove that Bryant had given his principal notice before he was charged with embezzlement that he had retained certain moneys which he declined to pay over on the ground that his principal was indebted to him.

It is true that after this account of Bryant, and his evidence as to the correctness thereof, had been permitted to go to the jury, the court instructed the jury that five of the principal items in the account could not be regarded as valid claims in his favor against the Singer Manufacturing Company; but this does not cure the error in admitting the account in evidence. The necessity for such an instruction rather accentuates the reasoning as to why the account and the evidence as to its correctness was irrelevant and inadmissible.

This account was composed of alleged claims for commissions

on sales of manufacturing machines and damaged machines, a claim arising years before out of transactions with the company at Danville, and commissions for collecting certain shortages from other agents, and overpaid traveling expenses, none of which were valid claims against the company, as the court, in its instruction, told the jury; yet the jury were left to consider evidence with reference to the account, which necessarily misled them to believe that, in considering the question whether plaintiffs in error had reasonable cause to believe Bryant guilty of the charge of embezzlement, the Singer Manufacturing Company, after it had discovered that Bryant had collected and appropriated its money, and after he had repeatedly certified that he had not collected the money, ought then to have presumed that he was keeping the money on account of claims against the company which Bryant had certified were not in existence. From no standpoint was this evidence admissible, and it should have been excluded.

There were eighteen instructions given by the court for Bryant, to all of which plaintiffs in error objected, except Nos. 11, 12, 13 and 18, but the exceptions to Nos. 9, 10 and 17 are mainly relied on here for a reversal of the judgment.

Plaintiffs in error had asked the court to instruct the jury as follows: "The court instructs the jury that the question of the guilt or innocence of C. F. Bryant of the charges set forth in the warrant is not in issue in this case. The question for the jury to determine is whether or not the defendants had reasonable cause to believe that he was guilty under the light of all the circumstances, as they existed and appeared to them at the time the warrant was sworn out; and if the jury believe from the evidence that defendants had reasonable and probable cause to believe, and did believe, that C. F. Bryant was guilty of the charge of embezzlement, then they must find for the de-

fendants." But the court, in lieu of this instruction, gave Bryant's instruction No. 9, which struck out the words, "The court instructs the jury that the question of the guilt or innocence of C. F. Bryant of the charges set forth in the warrant is not in issue in this case," and inserted in lieu thereof the words, "The court instructs the jury that they are not to determine the guilt or innocence of the plaintiff, but the question of his guilt or innocence may be considered upon the question of probable cause."

The instruction as given was not only misleading, but was inconsistent with the remaining instructions given, which told the jury that if the defendants had reasonable cause to believe the plaintiff was guilty they should find a verdict for the defendants. As we have repeatedly said, the question whether Bryant was guilty or innocent of the charge in the warrant was not in issue here, that issue having been determined by the justice in his favor, and instruction No. 9 is nothing more nor less than an instruction to the effect that the acquittal by the justice was evidence of want of probable cause. The decision of the justice had no relevancy in this case, except as evidence tending to- prove that the prosecution was ended, and it is difficult to understand how the jury could consider the question of the guilt or innocence of Bryant for any purpose without determining, in the first place, whether he was guilty or innocent; and this the jury were told that they could not determine.

The test of probable cause, says Cooley, in his work on Torts, page 211, is to be applied as of the time when the action complained of was taken; and if, upon the facts then known, the party had no probable cause for action, it will be no protection to him that facts came to his knowledge afterwards that might have constituted a justification had be been aware of them. In other words, the fact that the accused was acquitted of the

charge can have no bearing whatever upon the question whether the prosecutor, upon the facts then known to him, had probable cause for beginning the action, for what the decision of the trial court would be was not and could not then have been known to him nor influenced him in forming an opinion as to whether or not the accused was guilty of the offense; nor can the accused, in an action against the prosecutor for malicious prosecution, avail himself of occurrences after the prosecution was begun, as evidence of the want of probable cause for setting the prosecution on foot, for the manifest reason that the prosecutor cannot be fairly judged as to what were his reasons or motives for starting a prosecution except upon the facts and circumstances known to him at the time.

The well recognized definition of "probable cause" is conclusive that the test is to be applied as of the time when the action complained of was taken. Says Shaw, Ch. J., in *Bacon* v. *Towne,* 4 Cush. (Mass.) 217: "There must be such a state of facts as would lead a man of ordinary caution and prudence to believe and entertain an honest and strong suspicion that the person is guilty."

The same vice included in instruction No. 9 appears in instruction No. 10, and, therefore, the latter is in this respect also erroneous.

Exception is taken to the 17th instruction for the reason that it, without any qualification whatsoever, pointed out to the jury "the wealth, if any, of the defendants," as an element to be considered by them in estimating the damages of the plaintiff.

The sole evidence upon which that part of the instruction could rest is that the Singer Manufacturing Company was one of the largest and wealthiest companies engaged in the manufacture of sewing machines in the world. No evidence was introduced to show that Bryant was damaged, either mentally,

morally or physically, nor was there any evidence as to the ability of the other two defendants, Lambert and Jackson, to pay the damages that the jury might assess against all of the defendants jointly; and therefore the jury were left to fix their verdict, not according to the amount of damages proved, but according to the ability of one of the defendants to pay. It is true that punitive damages may be allowed where express malice is shown, and evidence of the defendant's wealth and pecuniary ability is admissible, and the reason for the rule admitting such evidence rests in the consideration that a pecuniary mulct, which would operate as a sufficient punishment to a man of small means, would be inadequate in the case of a person of great wealth, and what would be a proper penalty in the latter case would be excessive and immoderate in the former. The rule admitting such evidence is, as has often been said, "a 'fair corollary' of the the rule of exemplary damages, that is, damages imposed as a warning to others for the protection of the public." Jaggar on Torts, p. 628; *Winemiller* v. *Thrash,* 125 Ind. 353, 25 N. E. 350; 12 Am. & Eng. Ency. of Law, 47; *Harman* v. *Cundy,* 82 Va. 239.

In the last-named case, an action for slander, while it was held that where malice is shown, the jury, in estimating damages, should consider the standing of the parties, it was also held that the wealth of the defendant was only to be considered so far as it tended to show his rank and influence in society.

"But in an action against two or more defendants the pecuniary ability of one should not be considered by the jury in determining the damages to be assessed jointly. Thus, in an action against a corporation and one of its employees, for damages for injuries sustained through the alleged negligence of the latter, it was error to receive evidence of the wealth of the corporation for the purpose of enhancing the damages to

be assessed against both defendants." 12 Am. & Eng. Ency. of Law, *supra.*

In *Toledo, &c., Ry. Co.* v. *Smith,* 57 Ill. 517, a similar instruction came under review, and it was held to be erroneous, the opinion saying: "The instruction referred to recognizes the principle that the pecuniary ability of one defendant may be considered by the jury in determining the amount of damages which a codefendant shall have assessed against him. The law is not so unjust and unreasonable. Even if the jury were satisfied in regard to the ability of the company, this would not enable them to determine the damages which should be awarded against the conductor."   .   .   .

In *Railroad Company* v. *Henry,* 62 Ill. 142, it was held that the admission of evidence as to the wealth of one of the defendants, in an action against two or more defendants, was erroneous, and that such evidence was highly prejudicial to the defendant whose wealth had not been shown.

It is true that in the cases just cited the recovery was sought for an injury resulting from negligence, and for which both defendants were liable; but the principle there discussed and maintained applies as well to the case at bar.

The case of *Smith* v. *Winderlich,* 70 Ill. 426, was against three defendants sued jointly in trespass, one of whom it appeared was worth $500,000, and another $10,000 or $15,000, and the trial court instructed the jury that they should take into consideration the pecuniary ability of each individual defendant to pay punitive or exemplary damages in determining the amount of such damages. *Held:* That the instruction was a subversion of the very reason upon which an inquiry into pecuniary circumstances of the defendants could alone be justified, as it subjected defendants of widely different means to the same measure of punishment; and, it was observed, the jury

had evidently from the amount of the verdict administered the punishment so as to be felt by the wealthiest of the defendants.

This is but an illustration as to the extent of injurious results to which the rule invoked as justifying the instruction we have here under consideration would lead. The instruction has nothing in the evidence to rest upon except in the expressions used by one of the witnesses, that it, the Singer Manufacturing Company, is "the biggest sewing machine corporation in the world" and the "wealthiest"; and it would be a hard rule, as counsel contend, for plaintiffs in error, Lambert and Jackson, to be called upon by the verdict of the jury to pay damages estimated upon the wealth of the Singer Manufacturing Company, the "biggest" and "wealthiest" sewing machine corporation in the world.

We are of opinion, therefore, that so much of the instruction No. 17 as is here complained of, and which told the jury without qualification that "the wealth, if any, of the defendants" was to be considered by them as an element in estimating the damages which they might award by their verdict was plainly erroneous.

We come now to the consideration of the assignment of error to the refusal of the court below to set aside the verdict upon the ground that it was contrary to the law and the evidence.

The requisites to a recovery in a suit for malicious prosecution are (1) that the suit or proceeding has been instituted without any probable cause therefor; (2) that the motive in instituting it was malicious; and (3) that the prosecution was terminated in the acquittal or discharge of the accused.

The third requisite is not in question here, and there is no evidence of express malice in the institution of the criminal proceeding against Bryant; therefore, the only question to be

considered, upon the merits of this case, is whether or not the proof was sufficient to warrant the jury in finding that the prosecution complained of was without probable cause.

That the burden rested upon defendant in error to prove affirmatively the absence of probable cause is not questioned. While malice may be inferred from want of probable cause, no matter how much malice be shown, want of probable cause will not be inferred from it. Jaggard on Torts, 625.

The same author, at page 626, says that the American authorities are agreed with essential unanimity that what circumstances are sufficient to prove probable cause must be decided by the court; that where there is no conflict in the testimony as to what these circumstances are, the court must pass upon the whole case; but that where the evidence is conflicting it must be left to the jury to apply to the facts as found by them the law as to what constitutes reasonable and probable cause as defined by the court.

The statement of this case, made in the outset of this opinion, was made with due regard to the rule governing the consideration of the evidence by this court, and the facts there stated are practically uncontroverted. In addition to these facts, and more properly to be considered in connection with the assignment of error being discussed, the following facts appear from Bryant's own evidence:

First—That on May 8, 1901, he, as agent for the Singer Manufacturing Company, sold a machine to one Thomas and collected on that date $35.00 in cash, and was to have an additional $15.00, which was to be taken out by him in board. The sale of this machine and collection of the cash was never reported to the company, although defendant in error made a report each Saturday night, in accordance with the form we have referred to; and moreover he, on September 14, 1901,

reported this machine, by number, as being in his possession, when in fact he had sold it and collected the cash.

Second—That in the latter part of the year 1900 he sold a machine to one Houston, collected the entire purchase money therefor, but never reported the collection of the money or the sale of the machine, although it was delivered to Houston in 1900; and on September 14, 1901, eighteen days before he was discharged, Bryant reported this machine, by number, as being in the possession of "C. F. Bryant" in face of the fact that he had collected the money thereon and delivered the machine to the purchaser about nine months before this report was made.

Third—That in the summer of 1901 he sold a machine to one Smith, who ran a hotel in the city of Roanoke, and this sale was never reported to the company, but the value of the machine was credited to Bryant by the hotel keeper on account of board bill in August, 1901; and here again, he, on the 14th of September, reported the machine, by number, as being in the possession of "C. F. Bryant."

Fourth—That he sold to one Mrs. Loux, on August 30, 1901, a machine, for which he received $5.00 in cash, and subsequently collected the balance of the purchase money; yet never reported these collections to the company, and on September 14, 1901, reported the machine as being also in his possession.

Fifth—That on the 9th day of September, 1901, he collected from Edward Lyle, attorney for the Singer Manufacturing Company, $40.00, which Lyle paid to him for debts which he collected for the company; and on the 8th of June, 1901, he received also from Lyle $36.00, which had been collected by the attorney for the company; and although, after the payment, on June 8th, Bryant made a report each Saturday night of moneys collected, stating that the report showed all collections made by him for the company, and although after

the 9th of September he made similar reports to the company each Saturday night, he reported neither of the collections of cash from Lyle.

He boldly admits these facts, and only attempts to excuse himself for his default by saying that it was his intention to keep the money until he left the employment of the company, and then have a final settlement. He makes the claim that he communicated the fact of his collection of the money from Lyle (which were collections from Sachs and Talley) to Jackson, from Richmond, an employee of the company, some time in August, when, as a matter of fact, as shown by the checks he received for the money, part of the money from Sachs and from Talley was not collected until the 9th of September, 1901.

When the fact was brought to Bryant's attention, after he was discharged from the company's employ, that he had collected certain money for the company, he made no denial of it, nor suggested that he had a right to retain the money on account of the indebtedness of the company to him, but on the contrary, promised to pay the money over; and once or twice, when the agents of the company were investigating the condition of his office, he made an engagement to meet them with the view to a settlement of the matters between him and the company; but these engagements he did not keep. All the information that the Singer Manufacturing Company had as to Bryant's defalcation was derived from an investigation of the office at Roanoke by Jackson, and not from Bryant. The latter had concealed, beginning in December, 1900, so far as the officers of the company were concerned or those to whom he reported, the collection of the moneys in the statements showing the amount to be $313.72, which he made out about the time or after his arrest, for the information of his counsel, and he does

not claim to have told any one of the plaintiffs in error of these collections, except Jackson, as to the Sachs and Talley money, nor does he claim to have told anyone that he had used the money until Jackson began to investigate his office; and the only person he claims to have then communicated the fact to was a subagent under him, who had no duty to report it to the officers of the company, and who did not report it to the company or either of the plaintiffs in error. Now when he comes into court claiming damages for a malicious prosecution, in face of all the facts which have hereinbefore been stated, he claims that plaintiffs in error did not have reasonable or probable cause to believe him guilty of embezzlement, because the company should have known that he was making an honest claim for money due him by the company, and that the books in his own office would have shown the shipment of the machines he had sold but had not reported, and that he was responsible for them. The evidence, however, fails to show that the books indicated that these machines had been shipped out of the office, but on the contrary, the inventory, certified by Bryant, showed that the machines were charged up on the 14th of September, 1901, as being then in his possession. What conceivable reason had the company for investigating these books to ascertain whether any machines had been sold which had not been accounted for, when the company had the inventory certified by Bryant himself, that all of the machines consigned to him other than those he had sold and reported, were in his possession; and by what reasoning can the conclusion be reached that the company should have known that Bryant was making an honest claim for money due him by the company when he had time and again, in his weekly reports, up to the Saturday next preceding his discharge from the company's employ, over his own signature, declared that he had received everything that

was due him from the company? To fritter away the effect of the failure of a plaintiff in a suit like this to carry the burden resting upon him of proving affirmatively the absence of probable cause for prosecuting him for a criminal offense, by setting up a claim of a debt due to him from the defendant which he had never asserted, but on the contrary had over and over again stated in writing that the defendant owed him nothing, would make the road to a recovery of damages in such a suit much· more easily to be traveled than ever before, and without the sanction of law or reason.

As was said by Chief Justice Marshall, in *Farish* v. *Starke,* 3 B. Mon. (Ky.) 4, "If every man who suffers by the perpetration of a crime were bound, under the penalty of heavy damages, to ascertain before he commences a prosecution, that he has such evidence as will ensure a conviction, few prosecutions would be set on foot; the guilty would escape while conclusive evidence was sought for; offenses of every grade would, for the most part, go unpunished, and the penal law would be scarcely more than a dead letter. The law, therefore, protects the prosecutor if he have reasonable or probable ground for the prosecution, that is if he have such ground as would induce a man of ordinary prudence and discretion to believe in the guilt and to expect the conviction of the person suspected, and if he acts in good faith on such belief and expectation."

Bryant's palpable fraud was in selling machines committed to his custody, collecting the money therefor, and then reporting to the company that the machines were in his possession, not sold, which was false, as he admitted, and manifestly intended to conceal and defraud.

We are, therefore, of opinion that the uncontradicted evidence in this case shows conclusively that when plaintiffs in error instituted the prosecution complained of by Bryant, they

had knowledge of such a state of facts and circumtsances as would excite the belief in a reasonable mind, acting on such facts and circumstances, that Bryant was guilty of the crime for which he was prosecuted; and this being so, they had probable cause for their action, and are not liable in this suit, although it subsequently appeared that Bryant was not guilty.

Without asking that the judgment of the Circuit Court in his favor be reversed, modified or corrected, but merely because the same questions may arise in another trial of his case, counsel for Bryant made thirteen assignments of error, under Rule IX of this court, to rulings of the Circuit Court at the last trial.

Rule IX is as follows: "In any appeal, writ of error, or supersedeas, if error is perceived against any appellee or defendant, the court will consider the whole record as before them, and will reverse the proceedings, either in whole or in part, in the same manner as they would do were the appellee or defendant to bring the same before them, either by appeal, writ of error, or supersedeas, unless such error be waived by the appellee or defendant, which waiver shall be considered a release of all error as to him."

Manifestly the rule contemplates the bringing to the consideration of this court rulings of the trial court affecting the result of the trial, and the assignments of error in a proceeding at law must look to the reversal, modification or correction of the judgment under review, not merely to have passed upon by this court questions which may or may not arise at a subsequent trial of the case. This would impose an onerous burden upon this court and a needless task not contemplated by Rule IX. We, therefore, do not consider that we are called on to rule upon the cross-errors assigned by defendant in error.

The judgment of the Circuit Court must be reversed and annulled, the verdict of the jury set aside, and a new trial awarded.                                                          *Reversed.*