COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:  Judges AtLee, Causey and Senior Judge Haley
Argued at Richmond, Virginia


KRISTEN INGLESE

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 1007-21-2                      JUDGE JAMES W. HALEY, JR.
                                                    JULY 19, 2022

ALBEMARLE COUNTY DEPARTMENT
 OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
Claude V. Worrell, Jr., Judge

Payton R. Johnson (Elizabeth G. Thorne; Davies, Barrell, Will,
Lewellyn & Edwards, PLC, on briefs), for appellant.

Susan Baumgartner, Senior Assistant County Attorney (William M.
Marshall, Guardian *ad litem* for the minor child; Sheila C. Haughey,
Guardian *ad litem* for appellant; Marshall & Marshall, P.C.; Snook &
Haughey, P.C., on brief), for appellee.


Kristen Inglese (mother) appeals the circuit court's adjudicatory and dispositional orders

finding that she had abused or neglected her son, R.I., and transferring his custody to the Albemarle

County Department of Social Services. Mother argues that the circuit court erred in finding the

evidence sufficient to demonstrate abuse and neglect. Mother also argues that the circuit court erred

in determining that the Department made reasonable efforts to prevent removal and no less drastic

alternatives other than removal existed. Finally, mother asserts that the circuit court violated her

due process rights because it failed to adequately consider her religious objections to "western

medical practice." In an assignment of cross-error, the Department asserts that the circuit court

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

abused its discretion by refusing to admit mother's medical records as rebuttal evidence. Upon reviewing the record and briefs of the parties, we affirm the judgment of the circuit court.

BACKGROUND[1]

On appeal, "we view the evidence in the light most favorable to the prevailing party, in this case, the Department, and grant to it all reasonable inferences fairly deducible from the evidence." *King v. King George Dep't of Soc. Servs.*, 69 Va. App. 206, 210 (2018) (quoting *C. Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 386 (2012)).

R.I. was born on January 22, 2021, and weighed seven pounds and one ounce. R.I.'s hospital records indicated that mother refused all interventions and medication and initially refused to stay in the hospital overnight. Nevertheless, because she continued to have medical issues after the birth, the hospital staff persuaded her to stay overnight. The records also indicated that mother had a history of mental health issues and psychosis, which concerned hospital staff. Upon her release, mother did not have a car seat to transport R.I. home and went home in a taxi.

On February 11, 2021, the Department received a report alleging that R.I. looked thin and that mother had received no pre or postnatal care, suffered from untreated mental health issues, and had not provided any follow-up medical care for R.I. Because of R.I.'s young age, the Department attempted initial contact within twenty-four hours; it visited mother and R.I.'s home, left a business card on the front door, made phone calls, sent text messages, called the maternal

---

[1] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues appellant has raised. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

grandmother and paternal grandfather, called R.I.'s father, and called the police to attempt a welfare check.

On February 12, 2021, the Department briefly spoke with mother and observed R.I. through video chat. During the call, mother was unwilling to bring R.I. to a doctor's office for a weight check. Mother contemplated bringing R.I. to a provider she described as an herbalist or doula, but the Department insisted that a doctor check R.I.'s weight. Mother told the Department she was Buddhist, mothers know exactly what their children need, and she felt that R.I. was healthy.

The Department first observed R.I. in person on February 15, 2021. R.I.'s legs were very thin, and his bones and ribs were prevalent and visible. In addition, his skin was yellow, and he had trouble latching for breastfeeding. Mother told the Department that she was not willing to discuss the details of her mental health history but acknowledged having been previously hospitalized. After the Department discussed potential court intervention, mother stated she would allow an examination of R.I. by her doula, Dr. Sarita Bennett. Mother stated that if R.I. needed care, she would have a feeling, "like being aware that she or [R.I.] may need medical attention." Mother also stated that the family dog could alert her that something was wrong. Mother and R.I.'s biological father agreed to participate in a protective agreement which required that they cooperate with the Department, follow safe sleeping practices, follow up with Dr. Bennett, and comply with any recommendations provided to them.

Although mother agreed to take R.I. to Dr. Bennett for a weight check on February 18, 2021, the visit did not happen because mother thought Dr. Bennett was coming to her home, and there was inclement weather. R.I.'s father told the Department that "they would really prefer to wait" until the following week, but the Department explained it would seek court intervention if

- 3 -

a doctor did not check R.I.'s weight by February 19, 2021. Accordingly, mother took R.I. to Dr. Paul Wisman on February 19, 2021.

Dr. Wisman noted that R.I. weighed only five pounds, eleven and a half ounces, which was in the 0.01 percentile, and represented a loss of approximately twenty percent of his birth weight. Dr. Wisman's colleague, Dr. Alaina Brown, explained that newborns typically lose approximately ten percent of their body weight in the first week but regain that weight by fourteen days after birth. Dr. Wisman noted that R.I. was "extremely thin" and told mother that he would need to be admitted to the hospital if he did not gain weight.

After that appointment, the Department developed a safety plan that required R.I.'s parents to live with paternal grandmother so she could observe feedings every three hours. During the night of February 19, 2021, the Department received a call reporting that mother had left paternal grandmother's home and the safety plan had been violated. The Department developed a new safety plan the next day, which required maternal grandmother to stay with the family in their home, supervise feedings every three hours, and ensure medical follow up. That safety plan also was violated when maternal grandmother left the home because she reported feeling unsafe around R.I.'s father.

On February 20, 2021, the Department received a call from Dr. Brown. R.I. had missed a scheduled appointment with Dr. Brown, and she was concerned because of R.I.'s severe malnourishment and failure to thrive diagnosis. Dr. Brown believed that R.I. was at risk of serious illness, injury, or death and needed to be seen by a doctor that day. Dr. Brown disagreed with Dr. Wisman's treatment plan because she would have hospitalized R.I. after the February 19, 2021 appointment. Dr. Brown saw R.I. that night, and he had gained six ounces of weight. Dr. Brown opined that R.I. was still severely malnourished but was otherwise doing well. Mother told Dr. Brown that she did not want any technology around R.I. because they were

- 4 -

Buddhists, but nothing in Dr. Brown's research of Buddhism indicated that there should be no medical care.

On February 26, 2021, mother brought R.I. to a follow-up appointment with Dr. Brown. R.I. had gained more weight and looked healthier but remained in the 0.36 percentile. Dr. Brown noted that R.I. appeared thin, with hanging skin and low muscle bulk.

On March 4, 2021, the Albemarle County Juvenile and Domestic Relations District Court (the JDR court) entered an order granting the Department's request for an emergency removal of R.I. from mother's custody. After R.I.'s removal, mother called the Department and stated that the Department had kidnapped R.I. While R.I. had gained some weight at the time of his removal from mother's care, the Department attributed that weight gain to the supervision of grandparents ensuring that he was fed every three hours and was concerned that such supervision had ended. On March 23, 2021, the JDR court adjudicated that R.I. was abused or neglected and scheduled a dispositional hearing. The JDR court subsequently entered a dispositional order granting custody of R.I. to the Department and approving the Department's foster care plan. The JDR court awarded mother visitation with R.I. at the discretion of the Department. Mother appealed the JDR court's rulings to the circuit court.[2]

On August 27, 2021, the parties appeared before the circuit court. Mother testified that she did not want to bring R.I. to the well-baby check-up after they were discharged from the hospital because the visit was "money-motivated" and R.I. was well. Mother thought that a check-up on a baby who was well "was like gambling on the life of a child, where it seemed to be standard hospital procedure that a child be brought to see if the child was still well, and that did not sound

---

[2] R.I.'s biological father also appealed the JDR court's decisions to the circuit court but failed to appear for the hearing. Mother believed that father was present "in spirit" through her. The circuit court dismissed father's appeal.

right to me. I knew that was not right." Mother testified that she was a Buddhist, specifically Vipassana, a type of meditation.

Mother was upset that Dr. Wisman saw R.I. on February 19, 2021 in a room with no windows and believed "it is actually illegal for any child to be seen in a medical room without a window to the outdoors." Mother felt pressured to bring R.I. to the well-visit and testified that she should have "just been brave and not brought [him] to the well-baby check-up." Mother felt that the Department's use of technology violated her spiritual beliefs because "less use of a lot of technology is better for the earth and that means it's better for us all." Mother did not appreciate that the Department used iPads in her home near R.I. and claimed that they interrupted his play and feed schedule and outdoor time.

Mother felt that the Department's actions were for their financial gain. Mother testified that "there have been a lot of lies by the Department," the hospital where she gave birth, and all the doctors involved with the case. Mother believed that the child-welfare system should be abolished because it "has been affecting us all." Mother also testified that the doctors had contracts with the Department and could be paid to report a child to the Department. Mother felt that the Department was harassing her and interfering with her attempts to raise R.I. consistent with her Buddhist "religious freedom way of life."

Mother denied being a diagnosed schizophrenic or receiving disability payments. She admitted she had been under a guardianship until 2019 and been hospitalized during the guardianship; but she denied receiving any mental health treatment. Mother also denied bringing R.I. home from the hospital in a taxi because she did not have a car seat. Mother denied that there was ever a problem with R.I.'s weight and asserted the government was simply interfering with her "Native American, Buddhist way." She also denied that she did anything harmful to R.I. Mother

told the circuit court that she spiritually did not believe in psychological examinations and evaluations and would not comply with one if ordered by the court.

After mother's testimony, the Department offered mother's labor and delivery records from the hospital for admission as rebuttal evidence. The Department proffered that mother's records indicated a significant history of psychological concerns and schizophrenia, but mother had declined treatment. The Department also proffered that the records indicated a need for follow-up with R.I., which mother denied. Mother argued that the Department had the opportunity to present that evidence during its case-in-chief and objected to the entry in rebuttal. The circuit court sustained the objection and excluded the records from evidence.

After hearing evidence and argument, the circuit court adjudicated that R.I. was abused or neglected under three separate grounds and entered adjudicatory and dispositional orders. The circuit court found that mother was unable to recognize R.I.'s lack of weight and condition, to the point that R.I. could have been hospitalized. The circuit court found that mother was unable to comprehend what was happening with R.I. The circuit court transferred custody of R.I. to the Department and allowed visitation between mother and R.I. at the Department's discretion. The circuit court further ordered that the Department continue to make reasonable efforts in making appropriate service referrals to mother to accomplish the goals set forth in the foster care plan. This appeal follows.

ANALYSIS

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 558 (2018) (quoting *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be

disturbed on appeal unless plainly wrong or without evidence to support it." *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011) (quoting *Martin v. Pittsylvania Cnty. Dep't of Soc. Servs.*, 3 Va. App. 15, 20 (1986)).

## I. Abuse and Neglect

Mother argues that the evidence failed to prove that R.I. was abused or neglected because she was "providing good faith care for R.I. through spiritual means." Mother asserts that she abstained from western medicine due to her closely held beliefs and practice of Buddhism. Mother argues that she made every effort to meet the Department's demands for medical care and followed the providers' medical advice, which improved R.I.'s condition. Thus, she concludes that R.I. was not abused or neglected.

Mother, however, does not challenge the circuit court's finding that R.I. was abused or neglected "caused by the unreasonable absence or the mental or physical incapacity of the child's parent." Mother's failure to challenge the sufficiency of the evidence to support this abuse and neglect finding renders moot her claims regarding the other findings, because, even if we were to agree with mother regarding the other findings, the abuse and neglect finding would remain because of the circuit court's unchallenged third finding.

"[I]n 'situations in which there is one or more alternative holdings on an issue,' the appellant's 'failure to address one of the holdings results in a waiver of any claim of error with respect to the court's decision on that issue.'" *Johnson v. Commonwealth*, 45 Va. App. 113, 116 (2005) (quoting *United States v. Hatchett*, 245 F.3d 625, 644-45 (7th Cir. 2001)). "If we were to hold otherwise, 'an appellant could avoid the adverse effect of a separate and independent basis for the judgment by ignoring it and leaving it unchallenged.'" *Id.* (quoting *San Antonio Press v. Custom Bilt Machinery*, 852 S.W.2d 64, 65 (Tex. App. 1993)). Alternative findings provide distinct, individual grounds upon which a trial court has based its decision. *See City of Newport*

*News Dep't of Soc. Servs. v. Winslow*, 40 Va. App. 556, 563 (2003) (In termination of parental rights cases, alternative findings for termination provide distinct, "individual bases upon which a petitioner may seek to terminate parental rights."). "That said, we still must satisfy ourselves that the alternative holding is indeed one that (when properly applied to the facts of a given case) would legally constitute a freestanding basis in support of the trial court's decision." *Johnson*, 45 Va. App. at 117. "But, in making that decision, we do not examine the underlying merits of the alternative holding—for that is the very thing being waived by the appellant as a result of [her] failure to raise the point on appeal." *Id.*

The circuit court found that mother abused or neglected R.I. under three separate and distinct grounds: (1) mother created or inflicted a physical or mental injury not by accidental means, or created a substantial risk of death, disfigurement or impairment of bodily or mental functions; (2) mother neglected or refused to provide care necessary for R.I.'s health; and (3) R.I. was without parental care caused by the mental or physical incapacity of mother. Mother did not challenge the circuit court's finding that R.I. was without parental care caused by her mental incapacity. In this case, we find that the circuit court's mental incapacity finding serves "as an adequate and independent legal basis." *Id.* "Without reviewing the correctness of the circuit court's determination, we are satisfied that, if correct," the circuit court could have found that mother neglected R.I. because of her mental incapacity. *Ferguson v. Stokes*, 287 Va. 446, 453 (2014). "Accordingly, this ground forms a separate and independent basis to affirm the circuit court's ruling and we will not reverse it." *Id.*

## II. No Less Drastic Alternatives

Mother argues that the circuit court erred in finding no less drastic alternatives existed other than transferring custody of R.I. to the Department. She asserts that R.I. had gained weight

and "transitioned from breast feeding to solid foods and formula." She therefore posits that returning R.I. to her care under a child protective order was a "less drastic alternative."

After a child is found abused or neglected, the circuit court may, "[a]fter finding that there is no less drastic alternative, transfer legal custody, . . . to any of the following: . . . the local board of social services of the county or city in which the court has jurisdiction." Code § 16.1-278.2(A)(5)(c). Here, the record supports the circuit court's finding that there was no less drastic alternative than the transfer of R.I.'s custody to the Department. R.I. gained weight not because mother recognized that he had been abused and neglected and had amended her care of him, but because the Department instituted safety plans that required grandparents to supervise R.I.'s feedings every three hours. The safety plans failed, however, leaving R.I. in the care of his mother who refused to acknowledge the severity of his malnourishment. Indeed, mother repeatedly told the Department that R.I. was healthy. And at trial, she repeatedly testified that R.I. did not have weight issues and there was no possibility that she could ever harm R.I. Mother even told the circuit court that she regretted going to the initial weight check, should have "just been brave," and not brought R.I. to the doctor's office. Mother refused to acknowledge that anything was wrong with R.I. and despite her mental health history, refused to undergo a psychological evaluation. Accordingly, when the safety plans failed, no less drastic remedy existed other than to remove R.I from mother's care.

### III. Reasonable Efforts

Mother argues that the circuit court erred when it found that the Department made reasonable efforts to prevent R.I.'s removal because it did not give significant weight to the mischaracterization of facts in the Department's emergency removal affidavit. Mother argues that the facts as stated in the Department's affidavit are not the facts listed in Dr. Wisman's

treatment recommendations. Mother asserts that no evidence established that she breached any of the safety plans.

An order transferring the legal custody of a child to social services "shall be entered only upon a finding by the court that reasonable efforts have been made to prevent removal and continued placement in the home would be contrary to the welfare of the child." Code § 16.1-228.2(A)(5)(c). The Department must make "reasonable and appropriate" efforts to provide services. *Ferguson v. Stafford Cnty. Dep't of Soc. Servs.*, 14 Va. App. 333, 338 (1992). "'Reasonable and appropriate' efforts can only be judged with reference to the circumstances of a particular case. Thus, a court must determine what constitutes reasonable and appropriate efforts given the facts before the court." *Harrison v. Tazewell Cnty. Dep't of Soc. Servs.*, 42 Va. App. 149, 163 (2004) (quoting *Ferguson*, 14 Va. App. at 338-39).

Here, the record supports the circuit court's finding that the Department made reasonable efforts to prevent R.I.'s removal. The Department repeatedly tried to assist mother to get R.I. to a weight check and even allowed her to have an examination by Dr. Sarita Bennett. Nevertheless, mother failed to bring R.I. to Dr. Bennett's office when scheduled. Despite preferring to wait until the following week, the Department told mother that they would seek court intervention if the weight check did not happen by the following day.

After R.I.'s initial check-up revealed that he was severely malnourished and had lost twenty percent of his birth weight, the Department developed two separate safety plans to attempt to keep R.I. in mother's custody. Both safety plans required a grandparent supervise R.I.'s feedings every three hours. Nevertheless, the safety plans were violated because of mother's and R.I.'s father's behavior towards both paternal and maternal grandmothers; indeed, the first safety plan was violated the very night of its creation. The Department only sought removal of R.I. after the second safety plan was violated. While the plans themselves were not

entered into evidence, the Department provided uncontroverted testimony of their existence and their contents. Contrary to mother's argument, the evidence proved that mother breached both safety plans.

Although mother argues that the facts in the affidavit are different than Dr. Wisman's treatment recommendations, this is not the case. Dr. Wisman's treatment notes indicated that R.I. was "extremely thin," and Dr. Wisman informed mother that hospitalization would be required if R.I. did not gain weight. Despite this note, Dr. Brown opined that immediate hospitalization was needed under these circumstances. Every single attempt by the Department to ensure R.I.'s safety in mother's care was thwarted or resisted by mother herself. Based on these circumstances, we cannot say that the circuit court erred in finding that reasonable efforts were made to prevent R.I.'s removal.

## IV. Religious Objections

Mother argues that the circuit court violated her due process protections by failing to adequately consider her religious objections. Mother asserts that the circuit court substantially burdened her when it required her to submit to government authority to undergo medical evaluations that are against her beliefs.

Contrary to mother's arguments, the circuit court did not require her to undergo any medical evaluations. "[I]t is the firmly established law of this Commonwealth that a trial court speaks only through its written orders." *Winslow*, 40 Va. App. at 561 (quoting *Walton v. Commonwealth*, 256 Va. 85, 94 (1998)). "Appellate courts thus 'presume' that the trial court's order 'accurately reflects what transpired' during the proceedings below." *Id.* (quoting *Stamper v. Commonwealth*, 220 Va. 260, 280-81 (1979)).

It is apparent from the court's orders that it did not impose any such evaluation requirement at that time. Based upon mother's repeated statements at trial that she requested R.I. back in her

care that day, the circuit court *asked* whether mother would be willing to submit to a mental health evaluation but did not rule from the bench or in a written order that she was required to do so.  Rather, the circuit court told mother that she did not "have to do it, but it would certainly make the job of everyone so, so much more straightforward if we had a complete understanding of your history and what, if anything, might be accomplished through other kinds of therapy, if any."

Accordingly, the record demonstrates that the circuit court never ordered mother to submit to a medical evaluation.  Thus, her argument does not challenge a ruling of the court and will not be considered on appeal.  *See Williams v. Commonwealth*, 57 Va. App. 341, 347 (2010) (holding that an argument was waived on appeal when there was "no ruling for [this Court] to review").

## V.  Admission of Mother's Medical Records

The Department argues that the circuit court erred in refusing the admission of mother's medical records as rebuttal evidence.  The Department asserts that because evidence of a witness's credibility is always at issue, evidence testing that credibility was relevant and the circuit court should have admitted it.  The Department argues that the excluded medical records impeached mother about her history of schizophrenia and R.I.'s scheduled visits that she denied in her testimony.

Cross-errors are "designed for the correction of errors" against the Department "when some affirmative relief is sought here by way of reversal, modification, or correction of the judgment under review."  *Eastern Coal & Export Corp. v. Norfolk & W. Ry. Co.*, 133 Va. 525, 533 (1922).  As the Department seeks the affirmance of the circuit court's judgments, not "reversal, modification, or correction of the judgment under review," this assignment of error presents a moot question we need not consider.  *Id.* (citing *Singer Mfg. Co. v. Bryant*, 105 Va. 428 (1906)).

CONCLUSION

For the foregoing reasons, the judgment of the circuit court is affirmed.

*Affirmed.*